## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WILLIAM STIRSMAN, on behalf of himself and ALL OTHERS SIMILARLY SITUATED,<br><br>               Plaintiff,<br><br>    v.<br><br>JPMORGAN CHASE BANK, N.A., J.P. MORGAN INVESTMENT MANAGEMENT INC., BOARD OF DIRECTORS OF JPMORGAN CHASE & COMPANY, BOARD OF DIRECTORS OF JPMORGAN CHASE BANK, N.A., LINDA B. BAMMANN, JAMES A. BELL, FRANK J. BISIGNANO, CRANDALL C. BOWLES, STEPHEN B. BURKE, JAMES S. CROWN, JAMIE DIMON, TIMOTHY P. FLYNN, LABAN P. JACKSON, MICHAEL A. NEAL, LEE R. RAYMOND, WILLIAM C. WELDON, MATTHEW E. ZAMES, COMPENSATION & MANAGEMENT DEVELOPMENT COMMITTEE OF JPMORGAN CHASE & COMPANY, JPMORGAN CHASE 401(K) SAVINGS PLAN SELECTION COMMITTEE, JOHN C. DONNELLY, MARIANNE LAKE, JPMORGAN CHASE 401(K) SAVINGS PLAN EMPLOYEE PLANS INVESTMENT COMMITTEE, JPMORGAN CHASE 401(K) SAVINGS PLAN ADMINISTRATOR, BERNADETTE J. BRANOSKY, BLACKROCK, INC., and JOHN DOE 1-100,<br><br>               Defendants. | Case No.<br><br><br>**CLASS ACTION COMPLAINT** |

**TABLE OF CONTENTS**

I.      NATURE OF THE ACTION.................................................................................... 1

II.     JURISDICTION AND VENUE............................................................................... 3

III.    PARTIES ................................................................................................................ 3

        A.      Plaintiff.................................................................................................... 3

        B.      Defendants .............................................................................................. 3

IV.     THE PLAN ........................................................................................................... 10

        A.      The Plan's Structure.............................................................................. 10

        B.      The Plan's Investment Options.............................................................. 12

                1.      Core Funds ................................................................................. 13

                2.      Target Date Funds ..................................................................... 23

V.      DEFENDANTS' FIDUCIARY STATUS, GOVERNING
        SUBSTANTIVE LAW AND DEFENDANTS' UNLAWFUL CONDUCT ............... 24

        A.      Fiduciary Status Under ERISA............................................................. 24

        B.      Relevant ERISA Law Governing Defendants' Conduct................................. 25

                1.      Right of Action.......................................................................... 25

                2.      Loyalty and Prudence. .............................................................. 26

                3.      Prohibited Transactions. ........................................................... 27

                4.      Co-Fiduciary Liability. ............................................................. 28

                5.      The Duty to Monitor.................................................................. 30

                6.      Non-Fiduciary Liability for Participation in Fiduciary
                        Breaches of Loyalty and Prudence and Prohibited
                        Transactions. ............................................................................. 30

        C.      Scope of Fiduciary Status and Liability. ............................................... 30

        D.      Defendants' Fiduciary Status and Unlawful Conduct........................... 31

E.     The EPIC Breached Its Fiduciary Duties of Loyalty and Prudence By Selecting and Retaining the Unduly Expensive Core Funds and Target Date Funds as Investment Options in the Plan. ...................................... 33

F.     The EPIC Committed Prohibited Transactions When It Selected and Retained Funds and Target Date Funds That Were Expensive or That Resulted From Conflicts of Interest as Investment Options in the Plan. ......................................................................................................... 34

VI.    CLASS ACTION ALLEGATIONS ............................................................ 35

VII.   CLAIMS FOR RELIEF .............................................................................. 38

VIII.  PRAYER FOR RELIEF ............................................................................. 50

## I.    NATURE OF THE ACTION

1.    This is a class action brought pursuant to the Employee Retirement Income Security Act of 1974, as amended, ("ERISA"), 29 U.S.C. § 1001 *et seq.*, for violations of ERISA's fiduciary duties and prohibited transaction provisions. Plaintiff William Stirsman and members of the putative Class are current and former participants in the JPMorgan Chase 401(k) Savings Plan (the "Plan"), a defined contribution plan sponsored by Defendant JPMorgan Chase Bank, National Association ("Chase Bank"). Plaintiff seeks to redress losses to the Plan, obtain Plan-wide injunctive relief, and secure disgorgement of unjust profits, pursuant to ERISA §§ 409 and 502(a)(2) and (3), 29 U.S.C. §§ 1109 and 1132(a)(2) and (3).

2.    The losses to the Plan and windfall profits to J.P. Morgan Investment Management Inc. ("JPMIM"), an asset management subsidiary of Chase Bank's corporate parent, JPMorgan Chase & Company ("JPMorgan Chase"), and BlackRock, Inc. ("BlackRock"), a longtime business partner of JPMorgan Chase, are the result of conflicted and imprudent and disloyal decisions by Defendants with respect to the selection and retention of investment options in the Plan and the investment of the Plan's assets. The fiduciary Defendants are required by ERISA to act prudently and solely in the interest of Plan participants and beneficiaries when selecting and maintaining the investment options of the Plan. Defendants did not do so. Instead, they put their affiliates and third-parties' interests ahead of the interests of the Plan and its participants and beneficiaries by selecting and maintaining the unduly expensive affiliated investment options that generated revenue for JPMIM. In addition, the fiduciary Defendants gave preferential treatment to the unduly expensive investment options managed by BlackRock, a global asset management company with whom Defendants had a longstanding business relationship, in an effort to further their business relationship and interests. During the Class Period (defined *infra*), ***more than 70%*** of all investment options in the Plan were managed by JPMIM or BlackRock.

3.      Purportedly acting on behalf of the Plan, the fiduciary Defendants selected and maintained unduly expensive investment options managed by JPMIM and BlackRock in the Plan, despite having access to comparable investment options offered by other companies that were cheaper and performed just as well, if not better, than the investment options managed by JPMIM and BlackRock.

4.      By selecting and maintaining the more expensive investment options managed by JPMIM and BlackRock, the fiduciary Defendants placed their affiliates and third-parties' interests above the Plan's interests. Instead of selecting and maintaining investment options for the Plan based on objective criteria like cost and performance, the fiduciary Defendants selected and maintained investment options because they generated substantial revenue for JPMIM or BlackRock.

5.      Defendants' imprudent, disloyal, and conflicted decisions resulted in the Plan paying excessive and prohibited fees that substantially diminished the retirement savings of Plan participants and beneficiaries. Defendants therefore breached their fiduciary duties of loyalty and prudence—the highest duties known to the law—in violation of ERISA § 404, 29 U.S.C. § 1104, engaged in prohibited transactions in violation of ERISA § 406, 29 U.S.C. § 1106, and breached their duty to monitor their appointees and delegees in the performance of their fiduciary functions. Despite knowing of the breach of fiduciary duties and prohibited transactions, Defendants failed to prevent them in violation of ERISA § 405, 29 U.S.C. § 1105. Finally, both the fiduciary and non-fiduciary Defendants are liable to disgorge ill-gotten gains and provide other appropriate equitable relief for participating in the fiduciary breaches and prohibited transactions under ERISA § 502(a)(3), 29 U.S.C. 1132(a)(3).

## II.    JURISDICTION AND VENUE

6.    **Subject Matter Jurisdiction.** This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

7.    **Personal Jurisdiction.** ERISA provides for nationwide service of process. ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2). Defendants are either residents of the United States or subject to service in the United States and this Court therefore has personal jurisdiction over them. This Court also has personal jurisdiction over Defendants pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they would all be subject to the jurisdiction of a court of general jurisdiction in the State of New York.

8.    **Venue.** Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan is administered in this District, some or all of the fiduciary breaches for which relief is sought occurred in this District, some Defendants reside and/or transact business in this District, and Chase Bank has its principal place of business in this District.

## III.    PARTIES

### A.    Plaintiff

9.    Plaintiff William Stirsman is domiciled in and a resident of Bradenton, Florida. He was employed at Chase Bank from 1995 until he retired in 2014, and participated in the Plan during that time. As a participant, he invested, *inter alia*, in the Core Bond Fund offered by the Plan during the Class Period.

### B.    Defendants

10.    **Defendant JPMorgan Chase Bank, N.A. ("Chase Bank")** Chase Bank, a wholly-owned subsidiary of JPMorgan Chase, is a national banking association that has retail branches in 23 states and operates nationally. It is headquartered in Columbus, Ohio. Pursuant to the Plan

3

instrument, Chase Bank is the sponsor, trustee, and asset manager of the Plan, and the sponsor and fund manager of 23 investment options currently in the Plan.

11.    **Defendant J.P. Morgan Investment Management Inc. ("JPMIM").**[1] JPMIM is a registered investment adviser and one of the asset management subsidiaries of JPMorgan Chase. During the Class Period, JPMIM served as the investment adviser for the Core Bond Fund, the Small Cap Core Fund, and the Mid Cap Growth Fund, and received compensation via investment management fees and other payments from the Plan for its management of these funds. It is a Delaware corporation with its headquarters in New York, New York.

12.    **Defendants Board of Directors of JPMorgan Chase & Company and Board of Directors of JPMorgan Chase Bank, N.A. (collectively, the "Board").** Pursuant to the Plan instrument, the Board is a named fiduciary of the Plan and is responsible for designation and removal of the Plan Administrator and the Selection Committee as defined below. On information and belief, the individual members of the Board are as follows:

      a.    **Defendant Linda B. Bammann ("Bammann").** Bammann has been a member of the Board of JPMorgan Chase since 2013 and is responsible for selecting and monitoring members of the CMDC and has authority to make any changes deemed necessary to the Plan.

      b.    **Defendant James A. Bell ("Bell").** Bell has been a member of the Board of JPMorgan Chase since 2011 and is responsible for selecting and monitoring members of the CMDC and has authority to make any changes deemed necessary to the Plan.

---

[1] Plaintiff reserves the right to amend the allegations in his Complaint against Defendant JPMIM to allege fiduciary status should discovery reveal that Defendant JPMIM was a named fiduciary or functional fiduciary of the Plan.

c. **Defendant Frank J. Bisignano ("Bisignano").** Bisignano was a member of the Board of Chase Bank from 2005 to 2013 and had the authority to make any changes deemed necessary to the Plan and designated the CMDC to have oversight of the Plan.

d. **Defendant Crandall C. Bowles ("Bowles").** Bowles has been a member of the Board of JPMorgan Chase since 2006 and is responsible for selecting and monitoring members of the CMDC and has authority to make any changes deemed necessary to the Plan.

e. **Defendant Stephen B. Burke ("Burke").** Burke has been a member of the Board of JPMorgan Chase since 2004 and is responsible for selecting and monitoring members of the CMDC and has authority to make any changes deemed necessary to the Plan. As noted below, he is also a member of the CMDC.

f. **Defendant James S. Crown ("Crown").** Crown has been a member of the Board of JPMorgan Chase since 2004 and a director of the Board of Chase Bank since 2010. As a member of the Board, he is responsible for selecting and monitoring members of the CMDC and has authority to make any changes deemed necessary to the Plan.

g. **Defendant Jamie Dimon ("Dimon").** Dimon has been chief executive officer of JPMorgan Chase since December 31, 2005, and chairman of the Board of JPMorgan Chase since December 31, 2006. As a member of the Board, he is responsible for selecting and monitoring members of the CMDC and has authority to make any changes deemed necessary to the Plan.

h.  **Defendant Timothy P. Flynn ("Flynn").** Flynn has been a member of the Board of JPMorgan Chase since 2012 and is responsible for selecting and monitoring members of the CMDC and has authority to make any changes deemed necessary to the Plan.

i.  **Defendant Laban P. Jackson ("Jackson").** Jackson has been a member of the Board of JPMorgan Chase since 2004 and a member of the Board of Chase Bank since 2010. As a member of the Board, he is responsible for selecting and monitoring members of the CMDC and has authority to make any changes deemed necessary to the Plan.

j.  **Defendant Michael A. Neal ("Neal").** Neal has been a member of the Board of JPMorgan Chase since 2014 and is responsible for selecting and monitoring members of the CMDC and has authority to make any changes deemed necessary to the Plan.

k.  **Defendant Lee R. Raymond ("Raymond").**  Raymond has been a member of the Board of JPMorgan Chase since 2001and a director of the Board of Chase Bank since 1987. As a Board member, he is responsible for selecting and monitoring members of the CMDC and has authority to make any changes deemed necessary to the Plan. As noted below, he is also a member of the CMDC.

l.  **Defendant William C. Weldon ("Weldon").** Weldon has been a member of the Board of JPMorgan Chase since 2005 and the chairman of the Board of Chase Bank since 2013. As a member of the Board, he is responsible for selecting and monitoring members of the CMDC and has authority to make any changes deemed necessary to the Plan. As noted below, he is also a member of the CMDC.

m. **Defendant Matthew E. Zames ("Zames").** Zames has been the chief operating officer of JPMorgan Chase and the chief operating officer and a member of the Board of Chase Bank since April 2013. As Board member, he has the authority to make any changes deemed necessary to the Plan and designated the CMDC to have oversight of the Plan.

13. **Defendant Compensation & Management Development Committee of JPMorgan Chase & Company ("CMDC").** Pursuant to the CMDC's Committee Charter, the CMDC assists the Board of JPMorgan Chase with oversight of its compensation principles and practices by, *inter alia*, reviewing and approving the compensation and benefit programs and ensuring the competitiveness of these programs. The CMDC's duties and responsibilities include, *inter alia*: approving the delegation of authority to the head of human resources and the chief financial officer to appoint the administrator for the Plan, as well as the "Fiduciary Rules" and compensation for any named fiduciary of the Plan who is not an employee, and receiving reports regarding the operation of the Plan. On information and belief, the individual members of the CMDC are as follows:

n. **Defendant Burke.** Burke is a member of the CMDC. As noted above, he is also a member of the Board of JPMorgan Chase.

o. **Defendant Raymond.** Raymond is a member of the CMDC. As noted above, he is also a member of the Board of JPMorgan Chase and a director of the Board of Chase Bank.

p. **Defendant Weldon.** Weldon is a member of the CMDC. As noted above, he is also a member of the Board of JPMorgan Chase and the chairman of the Board of Chase Bank.

14.      **Defendant** JPMorgan Chase 401(k) Savings Plan Selection Committee (**"Selection Committee"**). Pursuant to the Plan instrument, the Board designated the Selection Committee as a named fiduciary of the Plan. The Selection Committee is comprised of the chief financial officer and the director of human resources of Chase Bank and is responsible for appointing members of the Employee Plans Investment Committee ("EPIC"). Members of the Selection Committee serve until they are replaced by the Board and are permitted to serve on both the Selection Committee and the EPIC. On information and belief, the individual members of the Selection Committee are as follows:

      q.      **Defendant John C. Donnelly ("Donnelly").** During the Class Period, Donnelly was the head of human resources for JPMorgan Chase and Chase Bank. As a result, he served on the Selection Committee and was given delegated authority by the CMDC to appoint the Plan Administrator.

      r.      **Defendant Marianne Lake ("Lake").** During the Class Period, Lake was, among other things, the chief financial officer of JPMorgan Chase and Chase Bank. As a result, she served on the Selection Committee and was given delegated authority by the CMDC to appoint the Plan Administrator.

15.      **Defendant** JPMorgan Chase 401(k) Savings Plan Employee Plans Investment Committee (**"EPIC"**). Pursuant to the Plan instrument, the EPIC is a named fiduciary of the Plan and has control and management of the assets of the Plan (except for the assets of the JPMorgan Chase Common Stock Fund). The EPIC has the exclusive power to manage, invest, and reinvest (including the power to acquire and dispose of) assets of the Plan. The EPIC also has the power to appoint a trustee or trustees (other than a directed trustee) and an investment manager or managers to assume all or portions of its asset management duties. It has the sole discretion to designate

investment options for the Plan. With the exception of the JPMorgan Chase Common Stock Fund, the EPIC may change or eliminate investment options or investment managers using its discretion at any time. The identities of the members of the EPIC are not yet known to Plaintiff. Plaintiff reserves the right to amend to name the defendant members of EPIC by their proper names as the record develops.

16.     **Defendant** JPMorgan Chase 401(k) Savings Plan Administrator **("Plan Administrator").** Pursuant to the Plan instrument, the "benefits executive" of JPMorgan Chase is the Plan Administrator and a named fiduciary of the Plan. The Plan Administrator has the powers and duties set forth in the Plan and those of an administrator under ERISA, and is responsible for a variety of duties, including, *alter alia*: (i) furnishing, publishing, and filing summary plan descriptions, annual reports/financial statements, summary annual reports, and reports of Plan participants' rights; (ii) maintaining records of the aforementioned documents and filings; (iii) approving payments of reasonable administrative expenses; (iv) appointing a directed trustee for the Plan; and (v) jointly controlling and managing the operation and administration of the Plan. On information and belief, the Plan Administrator is as follows:

s.     **Defendant Bernadette J. Branosky ("Branosky").** Branosky is the current "benefits executive" at JPMorgan Chase and the Plan Administrator. As the Plan Administrator, Branosky signed the Plan's Form 5500 filed with the Department of Labor ("DOL") for the plan years ending in 2011-2015.

17.     **Defendant** BlackRock, Inc. ("**BlackRock**").[2] BlackRock is a global investment management corporation and a registered investment adviser. During the Class Period, BlackRock served as the investment adviser for the Emerging Market Equity Index Fund, International Small

---

[2] Plaintiff reserves the right to amend the allegations in his Complaint against Defendant BlackRock to allege fiduciary status should discovery reveal that Defendant BlackRock was a named fiduciary or functional fiduciary of the Plan.

Cap Index Fund, International Large Cap Index Fund, Large Cap Growth Index Fund, Large Cap Value Index Fund, S&P 500 Index Fund, and Small Cap Index Fund, and received compensation via investment management fees and other payments from the Plan for its management of these funds. It is a Delaware corporation with its headquarters in New York, New York.

18.    **Defendants John Doe 1-100.** Defendants John Doe 1-100 are individuals responsible for carrying out the fiduciary tasks of Chase Bank, the Board, the CMDC, the Selection Committee, the EPIC, and/or the Plan Administrator in connection with the administration and/or management of the Plan. Because ERISA provides individual as well as entity liability, they are fiduciaries to the extent that they carried out the aforementioned entities' fiduciary responsibilities. Additionally, as directors, officers, or employees of Chase Bank speaking on behalf of their employer, the fiduciary breaches by John Doe 1-100 are also the liability of their employer under both principles of agency and the doctrine of *respondeat superior*. Plaintiff reserves the right to amend to identify the John Doe defendants as appropriate.

## IV.    THE PLAN

### A.    The Plan's Structure

19.    The Plan, sponsored by Chase Bank, is a "defined contribution plan" as defined by ERISA § 3(34), 29 U.S.C. § 1002(34). Pursuant to ERISA § 409, 29 U.S.C. § 1109, the relief requested in this action is on behalf of the Plan for the benefit of the Plan and its participants and beneficiaries.

20.    Employees are eligible to participate in the Plan if they are U.S. dollar-paid employees who receive salary or regular pay or earn draw, commissions, or production overrides; are regularly scheduled to work 20 or more hours per week; and are employed by JPMorgan Chase or one of its subsidiaries to the extent that such subsidiary has adopted the Plan.

10

21.     Full-time employees are eligible to enroll in the Plan as of the first day of their employment. Part-time employees are eligible to enroll in the Plan as of the first of the month following the completion of 60 days of service.[3]

22.     Newly hired and rehired eligible employees are automatically enrolled in the Plan at a three percent before-tax contribution rate unless they otherwise enroll themselves or opt out of the Plan within their first 31 days of eligibility. Further, unless employees elect a different rate, for employees who are automatically enrolled, their contribution rate is automatically increased annually by one percent until they reach a before-tax contribution rate of five percent. If employees do not make another investment election, their contributions are invested in a Target Date Fund based on each employee's age and an assumed retirement date of 65.[4]

23.     Employees can contribute up to 50% (in 1% increments) of their eligible compensation, which consists of their base salary/regular pay and variable incentive compensation, each pay period on a pre-tax and/or Roth 401(k) basis, subject to the annual legal limits provided in the Internal Revenue Code.

24.     JPMorgan Chase, Chase Bank and other participating affiliates make an annual matching contribution on behalf of their employees who have completed one year of service in an amount equal to 100% of the employee's contributions up to five percent of eligible compensation, provided that the employee is employed by JPMorgan Chase, Chase Bank, or the participating affiliate at the end of the calendar year and his or her total annual cash compensation is less than $250,000.

---

[3] Prior to October 3, 2013, part-time employees were eligible to enroll in the Plan as of the first of the month following the completion of 90 days of service.
[4] The automatic enrollment feature applies to employees were hired or those who became eligible on or after July 1, 2011.

25.     Employees are always 100% vested in the value of their own contributions. Employees become 100% vested in the value of any matching contributions after completing three years of total service. The value of any matching contributions can become vested earlier if an employee dies while an active employee or his or her employment is involuntarily terminated due to the permanent closing of a location, a reduction in force, corporation downsizing, or job elimination. Matching contributions will end when an employee stops contributing to the plan, reaches any plan or legal limits, is not receiving any compensation, is no longer employed by JPMorgan Chase, Chase Bank, or a participating affiliate, transfer to an affiliate or unit that does not participate in the Plan, or dies.

**B.     The Plan's Investment Options**

26.     The Plan provides employees two ways to invest: they can build their own portfolio among the Core Funds or they can choose one of the pre-diversified Target Date Funds.[5]

27.     Both the Core Funds and the Target Date Funds contain investment management fees, which are usually charged against the assets of the funds and, accordingly, reduce the performance of such funds. The amount of fees differs by fund. An investment fund that is managed as an index fund will likely have lower investment management fees and transactional costs as compared to an actively managed fund. These fees and transactional costs can have a significant impact on an employee's rate of return.

28.     In 2015, the U.S. Securities and Exchange Commission ("SEC") began an investigation into whether JPMorgan Chase was inappropriately steering its private-banking clients into its affiliated investment products rather than third-party investment products without disclosing certain conflicts of interest in order to generate investment fees for itself and its

---

[5] Employees are permitted to allocate portions of their money among different Core Funds and Target Date Funds.

affiliates—*i.e.*, the same conduct at issue in this case. The investigation included a review of pensions and other private-client accounts to which JPMorgan Chase owed fiduciary duties. After a year-long investigation, the SEC found that Chase Bank and its affiliate, J.P. Morgan Securities LLC, preferred to invest clients in JPMorgan Chase's own investment products without properly disclosing its preference, including a preference for mutual funds and other investment options managed by JPMorgan Chase affiliates. The investigation resulted in a $287 million settlement between the SEC and JPMorgan Chase, which included a cease-and-desist order for Chase Bank and its affiliate, as well as a parallel $40 million settlement between Chase Bank and the U.S. Commodity Futures Trading Commission.

29.      After the SEC's investigation exposed Chase Bank's self-interested and disloyal practices, the fiduciary Defendants attempted to cover their years-long imprudent, disloyal and self-interested decisions with respect to the Plan by belatedly removing certain expensive investment options from the Plan and reducing the fees of other expensive investment options in the Plan by changing their investment format or through negotiated fee reductions with BlackRock. Unfortunately, these long-overdue changes did little to reverse the hundreds of millions of dollars the participants and beneficiaries of the Plan lost in future retirement savings.

   **1.    Core Funds**

30.      The Core Funds provide employees a variety of investment options that fall under two basic asset classes: fixed income (bonds and cash alternatives) and equity (stocks). The Core Funds provide both actively managed and passively managed investment options.

31.      During the Class Period, the Plan offered between 20 and 22 Core Funds, the majority of which were investment options managed by JPMIM or BlackRock. Among these Core Funds were five expensive affiliated investment options managed by JPMIM—Core Bond Fund, Growth and Income Fund, Mid Cap Growth Fund, Mid Cap Value Fund, and Small Cap Core

Fund—and seven expensive investment options managed by BlackRock—Emerging Market Equity Index Fund, International Small Cap Index Fund, International Large Cap Index Fund, Large Cap Growth Index Fund, Large Cap Value Index Fund, S&P 500 Index Fund, and Small Cap Index Fund.

32.    ***Core Bond Fund***

33.    Prior to March 11, 2016, the Core Bond Fund was offered as a mutual fund managed by JPMIM and charged a net annualized expense ratio between 35 and 36 basis points, after waivers.[6] Accordingly, the Core Bond Fund was one of the most expensive investment options, and the most expensive bond investment option, in the Plan.

34.    During the Class Period, the Plan had between $360 million and $472 million in Plan assets invested in the Core Bond Fund as follows:

- As of December 31, 2011, the Plan had $402 million in Plan assets invested in the Core Bond Fund.

- As of December 31, 2012, the Plan had $437 million in Plan assets invested in the Core Bond Fund.

- As of December 31, 2013, the Plan had $360 million in Plan assets invested in the Core Bond Fund.

- As of December 31, 2014, the Plan had $364 million in Plan assets invested in the Core Bond Fund.

- As of December 31, 2015, the Plan had $372 million in Plan assets invested in the Core Bond Fund.

35.    Fees charged to Plan participants for these investments in the Core Bond Fund were in excess of fees charged by comparable mutual funds offered by other companies. For example, the Vanguard Core Bond Fund Admiral Shares (VCOBX)—an actively managed mutual fund with

---

[6] The net annualized expense ratio is the gross annualized expense ratio minus waiver of any expenses, such as investment adviser fees. However, waivers in expenses are not guaranteed and can be revoked at any time. Prior to March 11, 2016, the Core Bond Fund charged a gross annualized expense ratio between 41 and 48 basis points.

similar investment strategies—has an annualized expense ratio of 15 basis points, less than half of the net annualized expenses charged by the Core Bond Fund. The Vanguard Total Bond Market Index Fund Admiral Shares (VBMFX)—a passively managed mutual fund with similar investment strategies—has an annualized expense ratio of 6 basis points, 85% less than what was charged by the Core Bond Fund.

36.    Defendants could have selected a non-affiliated investment option comparable to the Core Bond Fund for the Plan at a significantly reduced cost to Plan participants, but they chose not to do so because of their imprudent, disloyal, and self-interested practice in favoring investment options managed by JPMorgan Chase or its affiliates or third-party funds in which it was self-interested or otherwise conflicted.

37.    As of March 12, 2016, the Core Bond Fund was converted from a mutual fund managed by JPMIM to a Commingled Pension Trust Fund managed by Chase Bank. As part of this conversion, Chase Bank pays the annual expenses charged to Plan participants for investing in the Core Bond Fund, reducing the annual expenses for this investment option to zero basis points. Other than this change, the Core Bond Fund remains substantially the same, including with respect to its investment strategies.

38.    Upon information and belief, as of March 11, 2016 (before it was converted to a commingled fund), the Plan had approximately $372 million in Plan assets invested in the Core Bond Fund.

### *Growth and Income Fund*

39.    Prior to June 14, 2013, the Growth and Income Fund was offered as an investment option managed by J.P. Morgan Asset Management (USA) Inc.[7] and, upon information and belief,

---

[7] J.P. Morgan Asset Management (USA) Inc. is the marketing name for the asset management businesses of JPMorgan Chase, which includes JPMIM.

charged a net annualized expense ratio of 65 basis points, after waivers. Thus, the Growth and Income Fund was among the most expensive investment options in the Plan.

40.     Fees charged to Plan participants for investments in the Growth and Income Fund were in excess of fees charged by comparable investment options (including both separate accounts and mutual funds). For example, the Vanguard Growth and Income Fund Admiral Shares (VGIAX)—an actively managed mutual fund with similar investment strategies—has an annualized expense ratio of 23 basis points, almost 65% less than what was charged by the Growth and Income Fund.

41.     On June 14, 2013, the EPIC removed the Growth and Income Fund from the Plan and replaced it with the Large Cap Value Index Fund, an index fund passively managed by BlackRock. The Large Cap Value Index Fund has an annualized gross expense ratio of 7 basis points, 89% less than what was charged by the Growth and Income Fund.

42.     Defendants could have selected a non-affiliated investment option comparable to the Growth and Income Fund for the Plan at a significantly reduced cost to Plan participants, but they chose not to do so because of their imprudent, disloyal, and self-interested practice in favoring investment options managed by JPMorgan Chase or its affiliates or third-party funds in which it was self-interested or otherwise conflicted.

43.     As noted below, as of April 1, 2016—following a year-long investigation by federal regulators into JPMorgan Chase's imprudent, disloyal, and self-interested practices in promoting investment options managed by Chase Bank or its affiliates or third-party funds in which it was self-interested—Defendants belatedly negotiated a reduction of the investment management fees for the investment options managed by BlackRock, including the Large Cap Value Index Fund.

The reduction in fee, lowered the Large Cap Value Fund's annualized gross expense ratio to 4 basis points, more than 93% less than what was charged by the Growth and Income Fund.

### *Mid Cap Growth Fund*

44.     Prior to November 6, 2015, the Mid Cap Growth Fund was offered as a mutual fund managed by JPMIM and charged a net annualized expense ratio of 93 basis points, after waivers.[8] Thus, the Mid Cap Growth Fund was the most expensive investment option in the Plan.

45.     During the Class Period, the Plan had between $301 million and $584 million in Plan assets invested in the Mid Cap Growth Fund as follows:

- As of December 31, 2011, the Plan had $301 million of its assets invested in the Mid Cap Growth Fund.

- As of December 31, 2012, the Plan had $345 million of its assets invested in the Mid Cap Growth Fund.

- As of December 31, 2013, the Plan had $521 million of its assets invested in the Mid Cap Growth Fund.

- As of December 31, 2014, the Plan had $584 million of its assets invested in the Mid Cap Growth Fund.

- Upon information and belief, as of November 5, 2015 (when it was removed as an investment option from the Plan), the Plan had approximately $584 million of its assets invested in the Mid Cap Growth Fund.

46.     Fees charged to Plan participants for these investments in the Mid Cap Growth Fund were significantly in excess of fees charged by comparable non-affiliated mutual funds. For example, the Vanguard Mid-Cap Growth Fund Investor Shares (VMGRX)—an actively managed mutual fund with similar investment strategies—has an annualized expense ratio of 36 basis points, less than half of the net annualized expenses charged by the Mid Cap Growth Fund. The

---

[8] Prior to March 11, 2016, the Mid Cap Growth Fund charged a gross annualized expense ratio between 111 and 120 basis points.

Vanguard Mid-Cap Growth Index Fund Admiral Shares (VMGMX)—a passively managed mutual fund with similar investment strategies—has an annualized expense ratio of 8 basis points, more than 90% less than what was charged by the Mid Cap Growth Fund.

47.    Defendants could have selected a non-affiliated investment option comparable to the Mid Cap Growth Fund for the Plan at a significantly reduced cost to Plan participants, but they chose not to do so because of their imprudent, disloyal, and self-interested practice in favoring investment options managed by JPMorgan Chase or its affiliates or third-party funds in which it was self-interested or otherwise conflicted.

48.    On November 6, 2015, the EPIC removed the Mid Cap Growth Fund from the Plan and replaced it with the State Street Global Advisors ("SSGA") S&P 400 Mid Cap Index Fund, a mutual fund managed by State Street Bank and Trust. The SSGA S&P 400 Mid Cap Index Fund— a passively managed mutual fund with similar investment strategies—has an annualized gross expense ratio of 4 basis points, 96% less than what was charged by the Mid Cap Growth Fund.

### *Mid Cap Value Fund*

49.    Prior to November 6, 2015, the Mid Cap Value Fund was offered as a separate account managed by Earnest Partners, LLP and charged a net annualized expense ratio of 42 basis points. Thus, the Mid Cap Value Fund was the fourth most expensive investment option in the Plan.

50.    Fees charged to Plan participants for investments in the Mid Cap Value Fund were in excess of fees charged by comparable investment options (including both separate accounts and mutual funds). For example, the Vanguard Mid-Cap Value Index Fund Admiral Shares (VMVAX)—a passively managed mutual fund with similar investment strategies—has an

annualized expense ratio of 8 basis points, almost 81% less than what was charged by the Mid Cap Value Fund.

51.     Defendants could have selected a non-affiliated investment option comparable to the Mid Cap Value Fund for the Plan at a significantly reduced cost to Plan participants, but they chose not to do so because of their imprudent, disloyal, and self-interested practice in favoring investment options managed by JPMorgan Chase or its affiliates or third-party funds in which it was self-interested or otherwise conflicted.

52.     On November 6, 2015, the EPIC removed the Mid Cap Value Fund from the Plan and replaced it with SSGA S&P 400 Mid Cap Index Fund, a mutual fund managed by State Street Bank and Trust. The SSGA S&P 400 Mid Cap Index Fund—a passively managed mutual fund with similar investment strategies—has an annualized gross expense ratio of 4 basis points, 90% less than what was charged by the Mid Cap Growth Fund.

### *Small Cap Core Fund*

53.     Prior to December 18, 2015, the Small Cap Core Fund was offered as a mutual fund managed by JPMIM and charged a net annualized expense ratio of 83 basis points, after waivers.[9] Included in the expense ratio were recordkeeping fees of 35 basis points paid to J.P. Morgan Retirement Plan Services, LLC, a wholly-owned subsidiary of JPMorgan Chase, which served as the recordkeeper for the Plan until September 2014.[10] Thus, the Small Cap Core Fund was the second most expensive investment option in the Plan.

54.     During the Class Period, the Plan had between $355 million and $597 million in Plan assets invested in the Small Cap Core Fund as follows:

---

[9] Prior to December 18, 2015, the Small Cap Core Fund charged a gross annualized expense ratio between 115 and 121 basis points.

[10] In September 2014, JPMorgan Chase sold J.P. Morgan Retirement Plan Services, LLC to Great-West Financial, which then became the Plan's recordkeeper. The Plan's current recordkeeper is Empower Retirement.

- As of December 31, 2011, the Plan had $355 million of its assets invested in the Small Cap Core Fund.

- As of December 31, 2012, the Plan had $406 million of its assets invested in the Small Cap Core Fund.

- As of December 31, 2013, the Plan had $588 million of its assets invested in the Small Cap Core Fund.

- As of December 31, 2014, the Plan had $597 million of its assets invested in the Small Cap Core Fund.

- As of December 31, 2015, the Plan had $372 million of its assets invested in the Small Cap Core Fund.

- Upon information and belief, as of December 18, 2015 (when it was removed as an investment option from the Plan), the Plan had approximately $372 million of its assets invested in the Small Cap Core Fund.

55.    Fees charged to Plan participants for these investments in the Small Cap Core Fund were well in excess of fees charged by comparable mutual funds offered by other companies. For example, the Vanguard Small-Cap Index Fund Admiral Shares (VSMAX)—a passively managed mutual fund with similar investment strategies—has an annualized expense ratio of 8 basis points, 90% less than what was charged by the Small Cap Core Fund.

56.    Defendants could have selected a non-affiliated investment option comparable to the Small Cap Core Fund for the Plan at a significantly reduced cost to Plan participants, but they chose not to do so because of their imprudent, disloyal, and self-interested practice in favoring investment options managed by JPMorgan Chase or its affiliates or third-party funds in which it was self-interested or otherwise conflicted.

57.    As of December 16, 2015, the Small Cap Core Fund was converted from a mutual fund managed by JPMIM to a separate account managed by Chase Bank. As part of this conversion, the administrative and recordkeeping fees were significantly reduced and Chase Bank now pays the annual expenses charged to Plan participants for investing in the Small Cap Core

Fund, reducing the annual expenses for this investment option to zero basis points. Other than this change, the Small Cap Core Fund remains substantially the same, including with respect to its investment strategies.

### *Core Funds Managed by BlackRock*

58.    Prior to April 1, 2016, the Plan offered seven investment options managed by BlackRock in collective trust vehicles: Emerging Market Equity Index Fund, International Small Cap Index Fund, International Large Cap Index Fund, Large Cap Growth Index Fund, Large Cap Value Index Fund, S&P 500 Index Fund, and Small Cap Index Fund. These seven investment options—which made up almost a third of the Core Funds—charged annual expenses of 7 to 18 basis points.

59.    As of April 1, 2016—following a year-long investigation by federal regulators which scrutinized JPMorgan Chase's imprudent, disloyal, and self-interested practices in promoting investment options managed by Chase Bank or its affiliates or third-party funds in which it was self-interested—Defendants belatedly negotiated a reduction of the investment management fees for the seven investment options managed by BlackRock, as shown in the following table:

| Fund | Pre-Reduction Expense Ratio | Post-Reduction Expense Ratio | % Reduction in Expense Ratio |
|---|---|---|---|
| Emerging Market Equity Index Fund | 18 basis points | 14 basis points | 22% |
| International Large Cap Index Fund | 10 basis points | 8 basis points | 20% |
| International Small Cap Index Fund | 16 basis points | 12 basis points | 25% |
| Large Cap Growth Index Fund | 7 basis points | 4 basis points | 43% |
| Large Cap Value Index Fund | 7 basis points | 4 basis points | 43% |

sf

| | | | |
|---|---|---|---|
| S&P 500 Index Fund | 4 basis points | 2 basis points | 50% |
| Small Cap Index Fund | 10 basis points | 5 basis points | 50% |

60.     The reduction in fees belatedly brought the expense ratios of these investment options in line with comparable investment options from Vanguard, as shown in the following chart:

| Fund | Post-Reduction Expense Ratio | Comparable Fund | Expense Ratio of Comparable Fund |
|---|---|---|---|
| Emerging Market Equity Index Fund | 14 basis points | Vanguard Emerging Markets Stock Index Fund Admiral Shares (VEMAX) | 14 basis points |
| International Large Cap Index Fund | 8 basis points | Vanguard Large-Cap Index Fund Admiral Shares (VLCAX) | 8 basis points |
| International Small Cap Index Fund | 12 basis points | Vanguard Small-Cap Index Fund Admiral Shares (VSMAX) | 8 basis points |
| Large Cap Growth Index Fund | 4 basis points | Vanguard Growth Index Fund Admiral Shares (VIGAX) | 8 basis points |
| Large Cap Value Index Fund | 4 basis points | Vanguard Value Index Fund Admiral Shares (VVIAX) | 8 basis points |
| S&P 500 Index Fund | 2 basis points | Vanguard 500 Index Fund Admiral Shares (VFIAX) | 5 basis points |
| Small Cap Index Fund | 5 basis points | Vanguard Small-Cap Index Fund Admiral Shares (VSMAX) | 8 basis points |

61.     Thus, Defendants could have offered the same, or nearly the same, investment options in the Plan at a significantly reduced cost to Plan participants prior to April 1, 2016, but they chose not to do so because of their imprudent, disloyal, and self-interested practice in favoring investment options managed by JPMorgan Chase or its affiliates or third-party funds in which it was self-interested or otherwise conflicted.

22

2.      **Target Date Funds**

62.      The Target Date Funds offer built-in diversification in a single investment option. Each Target Date Fund has a date in its name that corresponds to an expected "target" year—the date when employees expect to start withdrawing money from their account. The "target" year typically corresponds to the date of the employee's retirement. The Target Date Funds are diversified across a broad range of asset classes and automatically rebalanced based on the time until the target year. Target Date Funds with dates furthest in the future have the most aggressive investment mix (*i.e.*, they have a greater percentage invested in stocks and smaller investments in bonds and cash alternatives). As the target year approaches, Target Date Funds gradually become more conservative (*i.e.*, they have a greater percentage invested in bonds and cash alternatives and smaller investments in stocks).

63.      Prior to April 1, 2016, the Plan offered 10 Target Date Funds managed by Chase Bank, which made up a third of all investment options available in the Plan. The Target Date Funds charged annual expense ratios of 9 to 10 basis points.

64.      As of April 1, 2016—following a year-long investigation by federal regulators which scrutinized JPMorgan Chase's imprudent, disloyal, and self-interested practices in promoting investment options managed by Chase Bank or its affiliates or third-party funds in which it was self-interested—Defendants belatedly reduced the investment management fees for the 10 Target Date Funds, as shown in the following table:

| Fund | Pre-Reduction Expense Ratio | Post-Reduction Expense Ratio | % Reduction in Expense Ratio |
|---|---|---|---|
| Target Date Income Fund | 11 basis points | 8 basis points | 27% |
| Target Date 2015 Fund | 10 basis points | 6 basis points | 40% |
| Target Date 2020 Fund | 9 basis points | 6 basis points | 33% |

23

| | | | |
|---|---|---|---|
| Target Date 2025 Fund | 9 basis points | 6 basis points | 33% |
| Target Date 2030 Fund | 9 basis points | 6 basis points | 33% |
| Target Date 2035 Fund | 9 basis points | 6 basis points | 33% |
| Target Date 2040 Fund | 10 basis points | 6 basis points | 40% |
| Target Date 2045 Fund | 10 basis points | 6 basis points | 40% |
| Target Date 2050 Fund | 10 basis points | 6 basis points | 40% |
| Target Date 2055 Fund | N/A | 6 basis points | N/A |

65.    Thus, Defendants could have offered the same investment options in the Plan at a significantly cost to Plan participants prior to April 1, 2016, but they chose not to do so because of their imprudent, disloyal, self-interested and otherwise conflicted practices.

## V.    DEFENDANTS' FIDUCIARY STATUS, GOVERNING SUBSTANTIVE LAW AND DEFENDANTS' UNLAWFUL CONDUCT

### A.    Fiduciary Status Under ERISA.

66.    **Named Fiduciaries.** Every ERISA plan must have one or more "named fiduciaries." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1). The person named as the "administrator" in the plan instrument is automatically a named fiduciary, and in the absence of such a designation, the plan sponsor is the administrator. ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).

67.    *De Facto* **Fiduciaries.** ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions. Thus, a person is a fiduciary to the extent:

(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has

24

any discretionary authority or discretionary responsibility in the administration of such plan.

ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Pursuant to ERISA, whether someone is a "named fiduciary" is irrelevant to the analysis of the functional fiduciary status. Nor must there be a formal delegation of fiduciary responsibility or a fiduciary role for an individual to be found a fiduciary under the functional test.

**B.    Relevant ERISA Law Governing Defendants' Conduct.**

**1.    Right of Action.**

68.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant, beneficiary, or fiduciary for relief under ERISA § 409, 29 U.S.C. § 1109.

69.    ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

70.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes participants, beneficiaries, or fiduciaries to bring a civil action "to enjoin any act or practice which violates any provision" of ERISA or the terms of the plan or to obtain "other appropriate equitable relief" to redress such violations or to enforce ERISA or the plan, including, without limitation, injunctive relief and, as available under applicable law, constructive trust, reformation, surcharge, and equitable restitution.

     **2.**     **Loyalty and Prudence.**

71.     The fiduciary Defendants were bound by the duties of loyalty, exclusive purpose, and prudence, as described below.

72.     ERISA § 404(a), 29 U.S.C. 1104(a), charges fiduciaries with the duties of loyalty, exclusive purpose, and prudence. These duties are customarily referred to as the "highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2nd Cir. 1982), *cert. denied*, 459 U.S. 1069 (1982). ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), provides, in pertinent part, that a fiduciary shall discharge his or her duties with respect to a plan "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1) (duty of loyalty), for the "exclusive purpose" of "providing benefits to participants and their beneficiaries" and "defraying reasonable expenses of administering the plan," *id.* § 1104(a)(1)(A) (exclusive purpose duties of loyalty), and with the "care, skill, prudence, and diligence under the circumstances then prevailing that a prudent [person] acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims," *id.* § 1104(a)(1)(B) (duty of prudence).

73.     These duties entail, among other things:

(a)     The duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves, their affiliates, or third parties, *Bierwirth*, 680 F.2d at 271;

(b)     The continuing duty to monitor the prudence of investments and whether they are in the best interest of the participants and beneficiaries, and to make changes to investment selections or otherwise address characteristics of investments that are or become disloyal or imprudent. Accordingly, a fiduciary must systematically consider all the investments of the Plan at regular intervals to ensure that they are appropriate, *Tibble v. Edison Int'l*, 575

U.S. ---, 135 S. Ct. 1823 (2015); *Tibble v. Edison Int'l*, 135 843 F.3d 1187, 1197 (9th Cir. 2016);

(c)     The duty to be cost-conscious in incurring reasonable costs in the management of the plan, when monitoring, and reviewing investments, and in devising and implementing strategies for the investment and management of plan assets, *Tibble*, 575 U.S. ---, 135 S. Ct. 1823; *Tibble* 843 F.3d at 1197; and

(d)     The duty to disclose and inform, which encompasses: (i) a negative duty not to misinform; (ii) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (iii) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

### 3.     Prohibited Transactions.

74.     ERISA's prohibited transaction rules bar fiduciaries from certain acts because they are "party in interest" violations of ERISA § 406(a), 29 U.S.C. § 1106(a). Under ERISA, a "party in interest" includes a fiduciary, as well as entities providing any "services" to a plan, among others. *See* ERISA § 3(14), 29 U.S.C. § 1002(14).

75.      ERISA's prohibited transaction rules also bar fiduciaries from certain acts because they are self-interested and therefore become *per se* violations of ERISA § 406(b), 29 U.S.C. § 1106(b).

76.     ERISA's prohibited transaction rules are closely related to ERISA's duties of loyalty.

77.     ERISA § 406(a), 29 U.S.C. 1106(a), provides that transactions between a plan and a party in interest are prohibited transactions unless they are exempted under ERISA § 408, 29 U.S.C. § 1108:

(a) Transactions between plan and party in interest

27

Except as provided in section 1108 of this title:

> (1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—

>> (A) sale or exchange, or leasing, of any property between the plan and a party in interest;

>> (B) lending of money or other extension of credit between the plan and a party in interest;

>> (C) furnishing of goods, services, or facilities between the plan and a party in interest;

>> (D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan; or

>> (E) acquisition, on behalf of the plan, of any employer security or employer real property in violation of section 1107(a) of this title.

78.    ERISA § 406(b), 29 U.S.C. 1106(b), provides:

(b) Transactions between plan and fiduciary

A fiduciary with respect to a plan shall not--

> (1) deal with the assets of the plan in his own interest or for his own account,

> (2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or

> (3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

**4.    Co-Fiduciary Liability.**

79.    ERISA § 405(a), 29 U.S.C. § 1105(a), "Liability for Breach by Co-Fiduciary,"

provides, in pertinent part:

> In addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary

responsibility of another fiduciary with respect to the same plan in the following circumstances:

(1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;

(2) if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

80.    Co-fiduciary liability is an important part of ERISA's regulation of fiduciary responsibility. Because ERISA permits the fractionalization of the fiduciary duty, there may be, as in this case, several ERISA fiduciaries involved in a given issue, such as the management of an investment in a plan. In the absence of co-fiduciary liability, fiduciaries would be incentivized to limit their responsibilities as much as possible and to ignore the conduct of other fiduciaries. The result would be a setting in which a major fiduciary breach could occur, but the responsible party could not easily be identified. Co-fiduciary liability obviates this. Even if a fiduciary merely knows of a breach, a breach he had no connection with, he must take steps to remedy it:

[I]f a fiduciary knows that another fiduciary of the plan has committed a breach, and the first fiduciary knows that this is a breach, the first fiduciary must take reasonable steps under the circumstances to remedy the breach. … [T]he most appropriate steps in the circumstances may be to notify the plan sponsor of the breach, or to proceed to an appropriate Federal court for instructions, or bring the matter to the attention of the Secretary of Labor. The proper remedy is to be determined by the facts and circumstances of the particular case, and it may be affected by the relationship of the fiduciary to the plan and to the co-fiduciary, the duties and responsibilities of the fiduciary in question, and the nature of the breach.

1974 U.S.C.C.A.N. 5038, 5080. Further, a co-fiduciary who enables a breach is liable even if the co-fiduciary did not know about the breach. *Id.*

5.     **The Duty to Monitor.**

81.     A fiduciary that appoints another person to fulfill all or part of its duties, by formal or informal hiring, subcontracting, or delegation, assumes the duty to monitor that appointee to protect the interests of the ERISA participants and beneficiaries. The power to appoint, retain, and remove plan fiduciaries or service providers confers fiduciary status upon the person holding such power. Thus, an appointing fiduciary must take prudent and reasonable action to determine whether the appointees are fulfilling their own separate fiduciary obligations.

6.     **Non-Fiduciary Liability for Participation in Fiduciary Breaches of Loyalty and Prudence and Prohibited Transactions.**

82.     Fiduciary status is not required for liability under ERISA where non-fiduciaries participate in and/or profit from a fiduciary's breach or prohibited transaction. Accordingly, Plaintiff makes claims against JPMIM and BlackRock that may have no fiduciary status with respect to the Plan, but that nevertheless must restore unjust profits or fees and/or are subject to other appropriate equitable relief, pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), and under the *Harris Trust* doctrine. *See Harris Trust & Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238 (2000).

C.     **Scope of Fiduciary Status and Liability.**

83.     Both action and nonfeasance can establish ERISA violations. Moreover, often the very same roles, conduct, activities, or failures to act, that establish fiduciary status also will establish substantive ERISA violations.

84.     Corporations and non-human entities or defined groups can only act through their human counterparts. Courts recognize corporate agency principles under ERISA for the purposes not only of determining corporate or entity liability for fiduciary breach, but also for the purpose of determining fiduciary status. Thus, individuals who are also agents of a corporation or entity

30

can act in ways that impose not only personal fiduciary liability on these individuals, but also fiduciary liability on the corporation or entity they represent or on whose behalf they act.

85.     Further, the doctrine of *respondeat superior* renders entities liable for the fiduciary acts of their employees.

86.     Finally, under basic tenets of corporate law, an entity is imputed with the knowledge that its officers and employees had regarding alleged misconduct, as herein, even if such knowledge is not communicated to the organization.

**D.     Defendants' Fiduciary Status and Unlawful Conduct.**

87.     As described above, except for Defendant JPMIM and Defendant BlackRock, Defendants were Plan fiduciaries and owed fiduciary duties to the Plan and its participants and beneficiaries because they were named fiduciaries in the Plan instrument, they had or exercised discretionary authority, control, or responsibility regarding management or administration of the Plan—making them fiduciaries under the first prong of ERISA § 3(21)(A)(i), as well as under ERISA § 3(21)(a)(iii), and/or they exercised any authority or control over Plan assets—making them fiduciaries under the second prong of ERISA § 3(21)(A)(i).

88.     The following factors both establish Defendants' fiduciary status with respect to the Plan, as well as speak to Defendants' substantive liability for the ERISA violations alleged herein:

A.     Chase Bank is the sponsor, trustee and asset manager of the Plan, as well as the sponsor and fund manager of 23 of the investment options currently in the Plan.

B.     The Board is a named fiduciary of the Plan. It is also a functional fiduciary because it has and exercises discretionary authority, control, or responsibility with respect to the management and/or administration of the Plan—namely, its designation and removal of the Plan Administrator and Selection Committee. In addition, the Board is a fiduciary

because it appoints the Plan Administrator and members of the Selection Committee and, accordingly, had a duty to monitor them.

        C.      The CMDC is functional fiduciary because it has and exercises discretionary authority, control, or responsibility with respect to the management and/or administration of the Plan—namely, it approves the delegation of authority to the head of human resources, and the chief financial officer to appoint the plan administrator for the Plan, as well as the "Fiduciary Rules" and compensation for any named fiduciary of the Plan who is not an employee, and receives reports regarding the operation of the Plan.

        D.      The Selection Committee is a named fiduciary of the Plan. It is also a functional fiduciary because it has and exercises discretionary authority, control, or responsibility with respect to the management and/or administration of the Plan—namely, its appointment of members of the EPIC. Accordingly, the Selection Committee had a duty to monitor the EPIC.

        E.      The EPIC is a named fiduciary of the Plan. It is also a functional fiduciary because it has and exercises discretionary authority, control, or responsibility with respect to the management and/or administration of the Plan—namely, its control and management of the Plan assets, its power to appoint a trustee(s) and an investment manager(s), and its exclusive authority to designate investment options for the Plan.

        F.      The Plan Administrator is a named fiduciary of the Plan. It is also a functional fiduciary because it has and exercises discretionary authority, control, or responsibility with respect to the management and/or administration of the Plan—namely, its finishing, publishing, and filing of various financial and regulatory documents and maintenance of such documents, its approval of payments of reasonable administrative

expenses, its appointment of a directed trustee, and its joint control and management of the operation and administration of the Plan.

89.     Through the foregoing roles, conduct, and failures to act with respect to the Plan's investment options and the Plan assets invested in them, not only were these Defendants named fiduciaries and functional fiduciaries, but they also violated ERISA by breaching their duties of loyalty, exclusive purpose, and prudence, engaging in prohibited transactions, and breaching their duty to monitor other fiduciaries, as set forth further below.

**E.     The EPIC Breached Its Fiduciary Duties of Loyalty and Prudence By Selecting and Retaining the Unduly Expensive Core Funds and Target Date Funds as Investment Options in the Plan.**

90.     As discussed above, ERISA § 404(a), 29 U.S.C. 1104(a), imposes on a fiduciary the duties of loyalty, exclusive purpose, and prudence.

91.     Among other things, the EPIC is responsible for selecting and maintaining investment options for the Plan, which selections must be made prudently, solely in the interest of Plan participants and beneficiaries, and for the exclusive purpose of providing benefits to Plan participants and beneficiaries and defraying reasonable expenses of administering the Plan.

92.     The EPIC had and exercised discretion to select and maintain the investment options of the Plan. During the Class Period (and many years before that), the EPIC used that discretion to direct billions of dollars of Plan assets into investment options that were managed by JPMIM or BlackRock, thereby generating significant revenue for JPMIM, an affiliate of JPMorgan Chase, and BlackRock, with whom JPMorgan Chase had a longstanding business relationship.

93.     The EPIC selected and maintained these unduly expensive investment options managed by JPMIM or BlackRock over cheaper, comparable investment option offered by other companies because they generated revenue for JPMIM and/or BlackRock. Accordingly, the

EPIC's selection and retention of these improper investment options was imprudent, disloyal, and self-interested.

**F.     The EPIC Committed Prohibited Transactions When It Selected and Retained Funds and Target Date Funds That Were Expensive or That Resulted From Conflicts of Interest as Investment Options in the Plan.**

94.     As discussed above, ERISA § 406, 29 U.S.C. § 1106, prohibits certain transactions between a plan and a party in interest or a plan and a fiduciary.

95.     ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D), provides that a fiduciary shall not cause the plan to engage in a transaction if the fiduciary knows or should know that such transaction constitutes a direct or indirect transfer to, or use by or for the benefit of a party in interest, of any assets of the plan.

96.     ERISA § 406(b)(1) and (2), 29 U.S.C. § 1106(1) and (2), provides that a fiduciary shall not deal with the assets of the plan in his own interest or for his own account, or in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries.

97.     JPMIM is an asset management subsidiary of JPMorgan Chase. As such, JPMIM is and was at all times relevant hereto a party-in-interest with respect to the Plan within the meaning of ERISA § 3(14)(G), 29 U.S.C. § 1002(14)(G). In addition, because JPMIM served as an investment adviser for and managed several investment options in Plan, it is and was at all relevant times relevant a party-in-interest with respect to the Plan within the meaning of ERISA § 3(14)(B), 29 U.S.C. § 1002(14)(B).

98.     BlackRock is a longtime business partner of JPMorgan Chase and served as an investment adviser for and managed several investment options in Plan. As such, BlackRock is

and was at relevant all times a party-in-interest with respect to the Plan within the meaning of ERISA § 3(14)(B), 29 U.S.C. § 1002(14)(B).

99.    In selecting and maintaining investment options that generated significant revenue for JPMIM or BlackRock, the EPIC caused the Plan to engage in transactions that it knew or should have known constituted a direct or indirect transfer to, or use by or for the benefit of a party in interest, of Plan assets.

100.    In addition, in selecting and maintaining investment options that generated significant revenue for JPMorgan Chase or its affiliates or BlackRock, the EPIC acted in transactions involving the Plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the Plan or the interests of its participants or beneficiaries.

101.    Accordingly, the EPIC's imprudent, disloyal, self-interested and otherwise conflicted decisions violated ERISA's prohibited transaction provisions.

## VI.    CLASS ACTION ALLEGATIONS

102.    Class Definition. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(1), 23(b)(2), and, in the alternative, 23(b)(3), on behalf of the following class:

> All participants and beneficiaries in the JPMorgan Chase 401(k) Savings Plan from March 7, 2011 to the date of judgment (the "Class Period") whose accounts had a balance in the Core Bond Fund, Growth and Income Fund, Mid Cap Growth Fund, Mid Cap Value Fund, Small Cap Core Fund, or any of the Core Bond Funds managed by BlackRock, Inc., or any of the Target Date Funds.

103.    The class excludes Defendants, their affiliates, subsidiaries, corporate parents, officers, directors, legal representatives, heirs, successors, predecessors, and assigns.

104.    **Class Period.** Plaintiff will seek class certification, losses, and other available relief for fiduciary breaches and prohibited transactions occurring within the entire period allowable under ERISA § 413, 29 U.S.C. § 1113.

35

105.    **Numerosity.** The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes that the Class includes thousands of participants and/or beneficiaries.

106.    **Commonality.** Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether certain Defendants are fiduciaries to Plaintiff, the Plan, and other members of the Class;

(b)    whether certain Defendants each owed a fiduciary duty under ERISA to Plaintiff and other members of the Class;

(c)    whether certain Defendants breached their fiduciary duties to Plaintiff and members of the Class by failing to act prudently, solely in the interests of the Plan's participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries; and/or for the exclusive purpose of defraying reasonable expenses of plan administration;

(d)    whether certain Defendants committed prohibited transactions under ERISA § 406, and if so, how;

(e)    whether certain Defendants otherwise violated ERISA;

(f)    whether Plaintiff and/or the Plan have suffered losses and, if so, what is the proper measure of damages; and

(g)    whether certain Defendants are liable to disgorge unjust profits to Plaintiff and/or the Plan as a result of their fiduciary breaches or prohibited transactions, and if so, what is the proper measure.

107. **Typicality.** Plaintiff's claims are typical of the members of the Class because Plaintiff asserts derivative claims on behalf of the Plan pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), and ERISA § 409, 29 U.S.C. § 1109, as well as Plan-wide relief under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), for conduct arising out of Defendants' conduct that was common to all participants and beneficiaries of the Plan affected by the fiduciary breaches and prohibited transactions and, thus, Plaintiff's claims are by definition identical to those of all Class members. Individual cases would require repeated proof of the same claims based on the same conduct of Defendants, using the same legal theories, and would seek the same relief.

108. **Adequacy.** Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action, complex, and ERISA litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

109. **Ascertainability.** The Class is ascertainable based on the investment options in which the Plan participants and beneficiaries invested, characteristics regarding which records exist.

110. **Rule 23(b)(1)(A) Requirements.** Class action status in this ERISA action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by members of the Class would create risk of establishing incompatible standards of conduct for Defendants.

111. **Rule 23(b)(1)(B) Requirements.** Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because, in light of the derivative nature of the claims asserted, prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

112.    **Rule 23(b)(2) Requirements.** Class action status in this ERISA action is warranted under 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

113.    **Rule 23(b)(3) Requirements.** If the Class is not certified under Rule 23(b)(1) or (b)(2), then Class action status in this ERISA action is warranted under Rule 23(b)(3) because questions of law and fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy. The factors in Rule 23(b)(3)(A), (B), (C), and (D) also support certification because each individual participant's or beneficiary's losses would not justify individual actions given the time and expense that this litigation will require, any similar litigation can be coordinated, and both the relevant fiduciary relationships and the losses or profits at issue are aligned across Class membership.

## VII.    CLAIMS FOR RELIEF

### COUNT ONE

### Breach of the Fiduciary Duties of Loyalty and Exclusive Purpose

### (Violation of ERISA § 404(a)(1) and (a)(1)(A), 29 U.S.C. 1104(a)(1) and (a)(1)(A))

### (Against Defendant EPIC)

114.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

115.    At all relevant times, the EPIC acted as a fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), as set forth above.

116.    ERISA's duties of loyalty, as set forth above, require fiduciaries to act "solely in the interest of the participants and beneficiaries," ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), and

for the "exclusive purpose" of "providing benefits to participants and their beneficiaries" and "defraying reasonable expenses of administering the plan, *id.* § 1104(a)(1)(A).

117.    The EPIC was disloyal in selecting and maintaining unduly expensive investment options managed by JPMIM or BlackRock. It selected and maintained these expensive investment options because they generated substantial revenue for JPMIM and BlackRock when cheaper, comparable non-affiliated investment options were available from other companies. In doing so, the EPIC put its financial interests above the Plan's interest and therefore breached its duties of loyalty to the Plan under ERISA § 404(a)(1) and (a)(1)(A), 29 U.S.C. § 1104(a)(1) and (a)(1)(A).

118.    As a direct and proximate result of these breaches of duty, the Plan, and indirectly Plaintiff and the Plan's other participants and beneficiaries, lost millions of dollars due to the imprudently high fees of the investment options managed by JPMIM and BlackRock.

119.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), and ERISA § 409(a), 29 U.S.C. § 1109(a), the EPIC is liable to restore all losses suffered by the Plan caused by its breaches of fiduciary duty.

## COUNT TWO

### Breach of the Fiduciary Duty of Prudence

### (Violation of ERISA § 404(a)(1)(B), 29 U.S.C. 1104(a)(1)(B))

### (Against Defendant EPIC)

120.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

121.    At all relevant times, the EPIC acted as a fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), as set forth above.

122.    ERISA's duty of prudence, as set forth above, requires fiduciaries to act with the "care, skill, prudence, and diligence under the circumstances then prevailing that a prudent [person] acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

123.    The EPIC was imprudent in selecting and maintaining unduly expensive investment options managed by JPMIM or BlackRock when cheaper, comparable non-affiliated investment options were available from other companies. A prudent and impartial fiduciary would have reviewed and investigated the availability of less expensive investment options in the marketplace both during the initial selection of the investment options as well as periodically during the Class Period, which would have resulted in replacement of the more expensive investment options managed by JPMIM and BlackRock with cheaper, comparable non-affiliated investment options offered by other companies. In failing to do so, the EPIC put its financial interests above the Plan's interest and therefore breached its duty of prudence to the Plan under ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

124.    As a direct and proximate result of these breaches of imprudence, the Plan, and indirectly Plaintiff and the Plan's other participants and beneficiaries, lost millions of dollars due to the imprudently high fees of the investment options managed by JPMIM and BlackRock.

125.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), and ERISA § 409(a), 29 U.S.C. § 1109(a), the EPIC is liable to restore all losses suffered by the Plan caused by its breaches of fiduciary duty.

## COUNT THREE

### Prohibited Transactions Between Plan and Fiduciary

### (Violation of ERISA § 406(b)(1) and (2), 29 U.S.C. § 1106(b)(1) and (2))

### (Against Defendant EPIC)

126.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

127.    At all relevant times, the EPIC acted as a fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), as set forth above.

128.    Under ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1), a fiduciary shall not deal with the assets of the plan in its own interest or for its own account.

129.    Under ERISA § 406(b)(2), 29 U.S.C. § 1106(b)(2), a fiduciary shall not in its individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries.

130.    The EPIC violated these prohibitions on transactions between a fiduciary and the Plan by selecting and maintaining options managed by JPMIM and BlackRock that generated significant revenue for JPMorgan Chase's affiliates and BlackRock.

131.    As a direct and proximate result of these prohibited transactions, the Plan, and indirectly Plaintiff and the Plan's other participants and beneficiaries, lost millions of dollars due to the conflicted fees of the investment options managed by JPMIM and BlackRock.

132.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), and ERISA § 409(a), 29 U.S.C. § 1109(a), and pursuant to ERISA§ 502(a)(3), 29 U.S.C. § 1132(a)(3), EPIC must

restore to the Plan and participants their losses and the unjust profits it allowed to be paid to Chase affiliates and BlackRock due to these prohibited transactions.

## COUNT FOUR

### Prohibited Transactions Between Plan and Party In Interest

### (Violation of ERISA § 406(a)(1)(D), 29 U.S.C. 1106(a)(1)(D))

### (Against Defendant EPIC)

133.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

134.    At all relevant times, the EPIC acted as a fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), as set forth above.

135.    At all relevant times, JPMIM was a party-in-interest with respect to the Plan within the meaning of ERISA § 3(14)(G), 29 U.S.C. § 1002(14)(G), because it is an asset management subsidiary of JPMorgan Chase. In addition, at all times relevant, JPMIM was party-in-interest with respect to the Plan within the meaning of ERISA § 3(14)(B), 29 U.S.C. § 1002(14)(B), because it served as an investment adviser for and managed several investment options in the Plan.

136.    At all relevant times, BlackRock was a party-in-interest with respect to the Plan within the meaning of ERISA § 3(14)(B), 29 U.S.C. § 1002(14)(B), because it served as an investment adviser for and managed several investment options in the Plan.

137.    Under ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D), a fiduciary shall not cause a plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect transfer to, or use by or for the benefit of a party in interest, of any assets of the plan.

138.    The EPIC violated this prohibition on transactions between the Plan and a party in interest through its actions and omissions in authorizing or causing the Plan to invest in the unduly expensive investment options managed by JPMIM and BlackRock, and pay, directly or indirectly, investment management and other fees in connection therewith, which caused the Plan to engage in transactions that the EPIC knew or should have known constituted a direct or indirect transfer to, or use by or for the benefit of a party in interest, of the assets of the Plan.

139.    As a direct and proximate result of these prohibited transactions, the Plan, and indirectly Plaintiff and the Plan's other participants and beneficiaries, lost millions of dollars due to the excessive fees of the investment options managed by JPMIM and BlackRock.

140.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), and ERISA § 409(a), 29 U.S.C. § 1109(a), as wells as § 502(a)(3), 29. U.S.C. § 1132(a)(3) EPIC is liable to restore all losses suffered by the Plan caused by its breaches of fiduciary duty, and unjust profits paid to Chase affiliates and BlackRock must be paid back to the Plan and participants.

## COUNT FIVE

### Non-Fiduciary Participation in Counts I-IV, pursuant to ERISA § 502(a)(3)

### (Against Defendants JPMIM and BlackRock)

141.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

142.    Count Five is brought against Defendant JPMIM and Defendant BlackRock.

143.    JPMIM and BlackRock had actual or constructive knowledge of and participated in and/or profited from the breaches of loyalty alleged in Count One, the breaches of prudence alleged in Count Two, the prohibited transaction claim alleged in Count Three, and the prohibited transaction claim alleged in Count Four, and they are liable to disgorge ill-gotten gains and/or

provide other appropriate equitable relief pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), and the Supreme Court's decision in *Harris Trust & Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238 (2000).

144.    Neither fiduciary nor party-in-interest status is required for liability under ERISA where, as here, non-fiduciaries participate in and/or profit from a fiduciary's breach of duty or a prohibited transaction. Accordingly, Plaintiff may bring claims against such entities even if they are not found to have fiduciary or party-in interest status themselves.

145.    JPMIM knowingly participated in the breaches of loyalty alleged in Count One by the EPIC because it managed a number of investment options in the Plan, and therefore knew that the breaches diminished the value of the Plan assets, thereby decreasing the value of the Plan participants' retirement savings accounts. BlackRock knowingly participated in the breaches of loyalty alleged in Count One by the EPIC because it managed a number of investment options in the Plan, and therefore knew that the breaches diminished the value of the Plan assets, thereby decreasing the value of the Plan participants' retirement savings accounts.

146.    JPMIM knowingly participated in the breaches of prudence alleged in Count Two by the EPIC because it managed a number of investment options in the Plan, and therefore knew the breaches would diminish the value of the Plan assets, thereby decreasing the value of the Plan participants' retirement savings. BlackRock knowingly participated in the breaches of prudence alleged in Count Two by the EPIC because it managed a number of investment options in the Plan, and therefore knew the breaches would diminish the value of the Plan assets, thereby decreasing the value of the Plan participants' retirement savings.

147.    JPMIM knowingly participated in the violations of ERISA's prohibited transaction provisions under ERISA § 406(b), Count Three, by the EPIC because it managed a number of

investment options in the Plan, and therefore knew or should have known that it was dealing with a fiduciary and that the prohibited transactions diminished the value of the Plan assets, thereby decreasing the value of the Plan participants' retirement savings.   BlackRock knowingly participated in the breaches of ERISA's prohibited transaction provisions under ERISA § 406(b), Count Three, by the EPIC because it managed a number of investment options in the Plan, and therefore knew or should have known that it was dealing with a fiduciary and that the prohibited transactions diminished the value of the Plan assets, thereby decreasing the value of the Plan participants' retirement savings.

148.     In regards to Count Four, as alleged above, both JPMIM and BlackRock are parties-in-interest. JPMIM had actual or constructive knowledge of the circumstances that made its transaction with the Plan violations of ERISA § 406(a). At all relevant times, JPMIM was an affiliate of JPMorgan Chase and served as an investment adviser for and managed a number of the investment options in the Plan, and therefore knew or should have known it was dealing with a fiduciary and that the prohibited transactions diminished the value of the Plan assets, thereby decreasing the value of the Plan participants' retirement savings. Similarly, BlackRock had actual or constructive knowledge of the circumstances that made its transaction with the Plan violations of ERISA § 406(a). At all relevant times, BlackRock served as an investment adviser for and managed a number of the investment options in the Plan, and therefore knew or should have known it was dealing with a fiduciary and that the prohibited transactions diminished the value of the Plan assets, thereby decreasing the value of the Plan participants' retirement savings.

149.     As a direct and proximate result of the breaches and prohibited transactions alleged in Count One through Count Four, and the participation therein of JPMIM and BlackRock alleged

in this Count, the Plan and its participants and beneficiaries lost millions of dollars or their assets were used to generate profits for JPMIM and Black Rock.

150.    Pursuant to ERISA, JPMIM and BlackRock must disgorge all ill-gotten against collected from the breaches of fiduciary duty and prohibited transactions, as well as the additional profits earned on such funds, and provide other appropriate equitable relief.

## COUNT SIX

### Failure to Adequately Monitor Other Fiduciaries

### (Violation of ERISA § 404, 29 U.S.C. § 1104)

### (Against Defendants Selection Committee and the Board)

151.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

152.    At all relevant times, Defendants the Board and Selection Committee acted as fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), as set forth above.

153.    As alleged above, the fiduciary responsibilities of the Board and the Selection Committee included appointing, evaluating, and monitoring of other fiduciaries, including, but not limited to, the members of the Selection Committee and the EPIC, the Plan Administrator, and various investment advisers and managers to whom certain fiduciary responsibilities were delegated.

154.    ERISA requires that monitoring fiduciaries ensure that their appointees and delegees are performing their fiduciary obligations, including those with respect to the selection and retention of investment options for the Plan and the investment of the Plan's assets. Further, monitoring fiduciaries must take prompt and effective action to protect a Plan and its participants when they are not doing so.

155.    The Board and the Selection Committee breached their fiduciary duty to monitor their appointees and delegees by, among other things: failing to disclose conflicts of interest that existed between Chase Bank and the investment options managed by JPMIM and BlackRock; failing to monitor and evaluate the performance of the Plan's fiduciaries or have a system in place for doing so; failing to monitor and evaluate the cost of the investment options in the Plan; failing to monitor the processes and policies by which the Plan's investment options were evaluated; and failing to remove fiduciaries whose performance was inadequate and/or who had engaged in imprudent, disloyal, and self-interested conduct.

156.    As a direct and proximate result of the Board's and the Selection Committee's breaches of their duty to monitor, the Plan, and indirectly Plaintiff and the Plan's other participants and beneficiaries, lost millions of dollars due to the imprudently high fees of the investment options managed by JPMIM and BlackRock.

157.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), and ERISA § 409(a), 29 U.S.C. § 1109(a), the Board and the Selection Committee are liable to restore all losses suffered by the Plan caused by their breaches of fiduciary duty.

**COUNT SEVEN**

**Co-Fiduciary Liability**

**(Violation of ERISA § 405, 29 U.S.C. § 1105)**

**(Against All Defendants Except JPMIM and BlackRock)**

158.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

159.    At all relevant times, Defendants Chase Bank, the Board, the CMDC, the Selection Committee, the EPIC, and the Plan Administrator acted as fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), as set forth above.

160.    ERISA § 405(a)(1), 29 U.S.C. § 1105(a)(1), imposes liability on a fiduciary, in addition to any liability which he or she may have had under any other provision of ERISA, if he or she knowingly participates in a breach of fiduciary duty of another fiduciary.

161.    Defendant Chase Bank is liable under ERISA § 405(a)(1), 29 U.S.C. § 1105(a)(1), because it managed the assets of the Plan and knew that the fiduciary breaches and prohibited transactions diminished the value of the Plan assets, thereby decreasing the value of the Plan participants' retirement savings.

162.    Defendant EPIC is liable under ERISA § 405(a)(1), 29 U.S.C. § 1105(a)(1), because it is a named fiduciary and it selected and retained the investment options in the Plan and knew that the fiduciary breaches and prohibited transactions diminished the value of the Plan assets, thereby decreasing the value of the Plan participants' retirement savings.

163.    ERISA § 405(a)(2), 29 U.S.C. § 1105(a)(2), imposes liability if a fiduciary in the administration of his or her fiduciary responsibilities enables another fiduciary to commit a breach, even without knowledge of the other's breach.

164.    Defendant Board is liable under ERISA § 405(a)(2), 29 U.S.C. § 1105(a)(2), because it is a named fiduciary and it had a duty to monitor and evaluate the members of the Selection Committee, but failed to do so.

165.    Defendant Selection Committee is liable under ERISA § 405(a)(2), 29 U.S.C. § 1105(a)(2), because it is a named fiduciary and it had a duty to monitor and evaluate the members of the EPIC, but failed to do so.

166.    ERISA § 405(a)(3), 29 U.S.C. § 1105(a)(3), imposes liability on a fiduciary, in addition to any liability which he or she may have had under any other provision of ERISA, if he or she knows of a breach by another fiduciary and fails to remedy it. Even if the fiduciary merely knows of a breach, he or she had no connection with, he or she must take steps to remedy it.

167.    Defendant CMDC is liable under ERISA § 405(a)(3), 29 U.S.C. § 1105(a)(3), because it received regular reports on the operation of the Plan which would have shown that the fiduciary breaches and prohibited transactions diminished the value of the Plan assets, including the value of the Plan participants' accounts.

168.    Defendant Plan Administrator is liable under ERISA § 405(a)(3), 29 U.S.C. § 1105(a)(3), because it is a named fiduciary and it had joint control and management of the operation and administration of the Plan.

169.    Defendants, each of whom were fiduciaries within the meaning of ERISA, knew of each breach of fiduciary duty or prohibited transaction alleged herein arising from Defendants selecting and maintaining the unduly expensive affiliated investment options managed by JPMIM and BlackRock, participated in each other's violations of ERISA, enabled each other's violations of ERISA, and took no steps to remedy those violations of ERISA. As such, each is liable for the breaches and prohibited transactions of the others pursuant to ERISA § 405(a)(1), (2), and (3), 29 U.S.C. § 1105(1), (2), and (3).

170.    As a direct and proximate result of these prohibited transactions, the Plan, and indirectly Plaintiff and the Plan's other participants and beneficiaries, lost millions of dollars due to the imprudently high fees of the affiliated investment options managed by JPMIM and BlackRock.

171.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), and ERISA § 409(a), 29 U.S.C. § 1109(a), Defendants are liable to restore all losses suffered by the Plan caused by their breaches of fiduciary duty.

## COUNT EIGHT

### Attorneys' Fees and Costs

### (Violation of ERISA § 502(g)(1), 29 U.S.C. § 1132(g)(1))

### (Against All Defendants)

172.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

173.    Pursuant to ERISA § 502(g)(1), 29 U.S.C. § 1132(g)(1), "the court in its discretion may allow a reasonable attorney's fee and costs of action to either party."

## VIII.  PRAYER FOR RELIEF

Under ERISA, each Defendant is jointly and severally liable for the losses suffered by Plaintiff and the Plan, the unjust profits collected by Defendants and other entities, and for the relief flowing from the foregoing Causes of Action.

WHEREFORE, Plaintiff prays for judgment against Defendants in the following manner:

A.    declaring that certain of the Defendants are fiduciaries for the purposes alleged here;

B.    declaring that certain of the Defendants have violated ERISA's duty of loyalty;

C.     declaring that certain of the Defendants have violated ERISA's duty of prudence;

D.  declaring that certain of the Defendants have violated ERISA's prohibited transaction provisions;

E.    enjoining Defendants from further such violations;

F.    adopting the measure of losses and disgorgement of unjust profits most advantageous to Plaintiff and the Plan, remedy Defendants' windfalls, and put Plaintiff and the Plan in

the position that they would have been in if the fiduciaries of the Plan had not breached their duties or committed prohibited transactions;

G.    ordering Defendants to restore all losses to the Plan and disgorge unjust profits;

H.    ordering Defendants to restore all lost investment returns that would have been invested in the Plan but for Defendants' unlawful conduct;

I.    ordering Defendants to pay Plaintiff and the Plan the amount of profits they earned on the funds they misappropriated from the Plan;

J.    ordering constructive trust, surcharge, and equitable restitution, as well as other such equitable monetary relief against Defendants as maybe appropriate;

K.    ordering other such remedial relief as may be appropriate, including the permanent removal of Defendants from any positions of trust with respect to the Plan and the appointment of independent fiduciaries to serve in the roles Defendants occupied with respect to the Plan, including as custodians, trustees, and investment managers;

L.    ordering that this action be certified as a class action on behalf of the class set forth herein and order that a common fund be established to distribute losses and other relief back to the Plan;

M.     enjoining Defendants from any further violations of ERISA;

N.    awarding Plaintiff costs and attorney's fees herein;

O.    awarding Plaintiff such other and further relief as to this Court may seem just and proper; and

P.    ordering Defendants to pay all of the foregoing.

DATED:  New York, New York
         March 8, 2017                         KELLER ROHRBACK L.L.P.


                                        By /s/ David S. Preminger
                                        David S. Preminger
                                        dpreminger@kellerrohrback.com
                                        Tanya Korkhov
                                        tkorkhov@kellerrohrback.com
                                        Keller Rohrback L.L.P.
                                        1140 Avenue of The Americas, 9th Floor
                                        New York, NY 10036
                                        Telephone: (646) 380-6690
                                        Facsimile: (646) 380-6692

                                        Lynn Lincoln Sarko (*pro hac* motion forthcoming)
                                        lsarko@kellerrohrback.com
                                        Derek W. Loeser (*pro hac* motion forthcoming)
                                        dloeser@kellerrohrback.com
                                        Erin M. Riley (*pro hac* motion forthcoming)
                                        eriley@kellerrohrback.com
                                        Gretchen S. Obrist (*pro hac* motion forthcoming)
                                        gobrist@kellerrohrback.com
                                        Keller Rohrback L.L.P.
                                        1201 Third Avenue, Suite 3200
                                        Seattle, WA 98101-3052
                                        Telephone: (206) 623-1900
                                        Facsimile: (206) 623-3384

                                        Khesraw Karmand (*pro hac* motion forthcoming)
                                        kkarmand@kellerrohrback.com
                                        1129 State Street, Suite 8
                                        Santa Barbara, CA 93101
                                        Telephone: (805) 456-1496
                                        Facsimile: (805) 456-1497

                                        ***Attorneys for Plaintiff***